NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                        :
GUY SCUDERI,                            :
                                        :
              Plaintiff,                :
                                        :         Civil Action No. 06-2213 (JAG)
              v.                        :
                                        :              **OPINION**
COMMISSIONER OF SOCIAL                  :
SECURITY,                               :
                                        :
              Defendant.                :
_____:


**GREENAWAY, JR., U.S.D.J.**


## I.  INTRODUCTION

        Plaintiff Guy Scuderi ("Plaintiff") seeks review of the Commissioner of Social Security's

("Commissioner") denial of his application for Disability Insurance Benefits ("DIB"), pursuant to

42 U.S.C. § 405(g).[1]  Plaintiff asserts that substantial evidence exists in the record to support a

finding of disability, and asks this Court to reverse the decision of the Commissioner, or in the

alternative, remand this claim to the Commissioner for reconsideration in light of alleged

deficiencies in the administrative hearing decision.  (Br. in Support of Pl. 1.)  For the reasons set

_____

        [1] This section of the Social Security Act ("Act") provides that any individual may obtain a
review of any final decision of the Secretary of Health and Human Services ("Secretary") made
subsequent to a hearing to which he or she was a party.  Under 42 U.S.C. § 405(g), the federal
district court for the district in which the plaintiff resides is the appropriate place to bring such an
action.

forth in this Opinion, this Court finds that the Commissioner's decision is supported by substantial evidence and should be affirmed.

## II. <u>PROCEDURAL HISTORY</u>

On September 13, 2002, Plaintiff filed an application for DIB and/or all other insurance benefits, for which he claimed he was eligible under Title II and part A of Title XVIII of the Social Security Act ("Act").[2]  (Tr. 109-11.)  He alleged that since March 18, 2002, he had been unable to work due to his disabling condition.  (Tr. 109-11.)  Plaintiff bases his claim on pain stemming from an idiopathic disorder, namely, syringomyelia.  (Br. in Support of Pl. 19.)  This disorder allegedly cannot be cured; is recognized by the Commissioner as a disabling condition at Paragraph 11.19 of the Listing of Impairments; is resistant to any sort of therapy; and is progressive.  (Br. in Support of Pl. 9.)  After the Social Security Administration ("SSA") denied Plaintiff's initial application on January 7, 2003 (Tr. 46-50), Plaintiff filed a request for reconsideration on January 15, 2003 (Tr. 53-54).  The SSA's denial of his claim was affirmed on March 6, 2003.  (Tr. 55-57.)  Plaintiff requested an administrative hearing on March 20, 2003.  (Tr. 58.)  After proper notice, a hearing was held before Administrative Law Judge Katherine C. Edgell (the "ALJ") on April 27, 2004.  (Tr. 325-52.)  On July 29, 2004, the ALJ held that Plaintiff was not entitled to disability insurance under § 216(i) or § 223 of the Act.  (Tr. 31-36.)  The ALJ found:

> 1.      The claimant met the special insured status requirements of the Act on March 18, 2002, his alleged onset date, and continues to meet them through December 31, 2007.

---

[2]  The Act instructs the Secretary to file, as part of her answer, a certified copy of the transcript of the record, including any evidence used to formulate her conclusion or decision.  42 U.S.C. § 405(g).  "Tr." refers to such transcript.

2

2.      The claimant has not engaged in "substantial gainful activity" from his
        alleged onset date through, at least, the date of this decision.
3.      The claimant does have "severe" impairments consisting of thoracic spinal
        cord syringomyelia and a disc bulge; but his impairments do not "meet"
        any impairment in the Listings.
4.      The claimant retains the "residual functional activity" to perform the
        demands of light exertion level work.  He should avoid hazards and
        frequent fine feeling/manipulations with his non[-]dominant hand.
5.      The claimant's "past relevant work" (as a butcher) required performing
        heavy exertion level work.
6.      The claimant is unable to perform his "past relevant work."
7.      The claimant was 45 years old on his alleged onset date, which classified
        him as a "younger individual."  20 C.F.R. § 404.1563.
8.      The claimant has a high school education.  20 C.F.R. § 404.1564..
9.      In view of the claimant's age, education and "residual functional
        capacity," the issue of transferability of work skills is not material.
10.     Given the claimant's age, education and "residual functional capacity," the
        Guidelines (Rules 202.21/.22) apply and direct a finding of "not disabled."
11.     The claimant has not been under a "disability"–as defined in § 216(i) and §
        223 of the Act–from March 18, 2002 (his alleged onset date) through at
        least, the date of this decision.

(Tr. 35.)  On January 13, 2005, Administrative Appeals Judge Rodney V. Tapp vacated the

ALJ's decision and remanded the case for further proceedings.  (Tr. 38-41.)  A new hearing was

held on November 2, 2005 (Tr. 353-411), and on February 10, 2006, ALJ Edgell issued another

unfavorable decision (Tr. 15-24).  Plaintiff timely sought review of the hearing by the Appeals

Council.  (Tr. 14.)  On March 17, 2006, the Appeals Council denied his request for review,

finding no reason to review the ALJ's decision.  (Tr. 9-12.)  Plaintiff then filed the instant action,

seeking reversal of the Commissioner's decision, pursuant to 42 U.S.C. § 405(g).

## III. STATEMENTS OF FACTS

### A.   Background

Plaintiff was born in the United States on July 24, 1956.  (Tr. 329.)  He has completed

school up to 12th grade, and has also completed a two year apprenticeship as a butcher.  (Tr. 330-

31.)  Plaintiff testified that he only has expertise as a butcher and a bartender.  (Tr. 331, 362-63.)
Plaintiff stopped working in any capacity in March 2002, due to his claimed disability.  (Tr. 331-33.)

**B.**     **Claimed Disabilities**

As this Court has noted, Plaintiff stopped working in March 2002, allegedly because of
severe permanent pain in the general area of his left shoulder blade.  (Tr. 333, 338, 342, 385.)
Plaintiff testified that the pain is constant, it never subsides, but sometimes it gets worse, and
then lessens.  (Tr. 338, 351-52, 357-58, 381, 386.)  He claims that he has numbness in his left
arm and left leg.  (Tr. 338-39, 348-49, 366, 386.)  Plaintiff has use of his left hand, although he
has numbness.  (Tr. 338-39, 348-49, 386-87.)  He can lift up to 40 pounds with his good right
hand.  (Tr. 348, 379-80.)  Plaintiff has stated that he only can sit for 15 to 30 minutes, and is
unable to stand for long periods of time.  (Tr. 349, 351, 358, 377.)  However, he does not use a
cane.  (Tr. 368.)  Plaintiff testified that he suffered from trouble with urination.  (Tr. 340, 368-71.)  Plaintiff also testified that he suffered from imbalance (Tr. 340, 358, 363, 367, 392-93), and
experienced anxiety attacks (Tr. 342-43, 358, 367, 389-91).

Plaintiff contends that he is right-handed.  (Tr. 361.)  He is allegedly able to drive, but
only on occasion, and not far from home.  (Tr. 361, 378-79.)  He also claims to have problems
with sustaining attention or concentration.  (Tr. 350.)  Plaintiff testified that he had persistent
sleeping problems.  (Tr. 343, 372, 375.)  The record indicates that his assortment of medications
caused grogginess, loss of balance, irritability, loss of concentration, and temperament changes.
(Tr. 373, 388.)  Finally, Plaintiff also has two herniated discs in his neck.  (Tr. 351.)

C.   **Medical Evidence Considered by the ALJ**

The record indicates that several physicians have evaluated Plaintiff.

1.   Dr. Donald J. Rose

Plaintiff was first examined by Dr. Donald J. Rose on April 10, 2000.  (Tr. 222.)  Plaintiff told Dr. Rose that he tore his rhomboid muscle in his left shoulder twelve years prior to his 2000 visit, during a lifting maneuver.  (Tr. 222.)  Since the time of the accident, Plaintiff claimed that he had experienced persistent and progressively increasing pain, and had recently noted clicking in the affected shoulder upon range of motion.  (Tr. 222.)  Physical therapy and pain medication did not provide significant relief.  (Tr. 222.)  An April 17, 1999, a magnetic resonance imaging ("MRI") test of his left shoulder revealed biceps tendonitis, but an MRI of the cervical spine was, upon review, relatively unremarkable.  (Tr. 222, 224.)  Physical examination of Plaintiff's left shoulder by Dr. Rose revealed pain and scapulothoracic crepitus upon range of motion.  (Tr. 222.)  Otherwise, testing of the left rotator cuff showed no deficit, with excellent strength on testing of the subscapularis and rotator cuff musculature.  (Tr. 222.)  The Speed test and modified O'Brien test were both negative.  (Tr. 222.)  Furthermore, there was no sign of subacromial tenderness or tenderness over the acromioclavicular joint.  (Tr. 222.)

Dr. Rose's first impression was mild left cervical radiculitis, with a history of a tear of the rhomboid muscle, with probable compensatory scapulothoracic bursitis of the left shoulder.  (Tr. 222.)  Plaintiff was given an injection into the scapulothoracic bursa, which relieved some of the discomfort in the region.  (Tr. 222.)  Dr. Rose also prescribed anti-inflammatory medication and physical therapy.  (Tr. 222.)  Finally, Dr. Rose recommended a follow-up visit in three months, if Plaintiff still felt symptomatic.  (Tr. 222.)

5

The record shows that Plaintiff did not seek further medical treatment for the next two years.  On April 15, 2002, Plaintiff returned to consult Dr. Rose, complaining of persistent pain in his left shoulder despite extensive physical therapy and multiple injections.  (Tr. 221.)  Dr. Rose found tenderness in the afflicted region, and noticed clicking upon range of motion.  (Tr. 221.)  Dr. Rose's first impression was scapulothoracic bursitis with possible bony lesion.  (Tr. 221.)  He recommended an MRI of the scapulothoracic joint to further investigate the source of the pain.  (Tr. 219, 221.)  A May 1, 2002, MRI revealed evidence of probable syringomyelia at the upper level of the thoracic spinal cord, but there were no significant abnormalities detected in the left scapula.  (Tr. 218.)  Dr. Rose conjectured that the evidence of probable syringomyelia in the thoracic spinal cord certainly could be the cause of Plaintiff's radiculopathy to the parathoracic region.  (Tr. 216.)  Dr. Rose recommended a follow-up visit, and referred Plaintiff to a neurologist.[3]  (Tr. 216.)

2.    Sutton Place Imaging

On July 11, 2002, Plaintiff undertook MRIs of his thoracic spine and cervical spine.  (Tr. 236-37.)  Dr. Steven Shankman provided reports of the testing.  (Tr. 236-37.)  The thoracic spine MRI revealed thoracic cord syrinx from the T3-4 level to approximately the level of T10.  (Tr. 236.)  There were no intradural, extramedullary lesions, and no evidence of disc herniation or

_____

[3]  A letter dated May 20, 2002, states that Dr. Rose referred Plaintiff to Dr. John Bendo, an orthopedic spine specialist at The Hospital for Joint Disease.  (Tr. 215.)  The Disability Report submitted by Plaintiff indicates in section 4, subsection D.2. (Tr. 128), that Plaintiff visited Dr. Bendo on May 10, 2002.  Plaintiff did not list what treatment he received at that visit.  (Tr. 128.)  Division of Disability Determination Services attempted to obtain medical records from Dr. Dominick Bendo in order to determine the medical conditions of Plaintiff, but Dr. Dominick Bendo claimed to have found no such record in his files.  (Tr. 228.)  The record does not contain any other specific information pertaining to medical treatment received from Dr. John/Dominick Bendo, nor has Plaintiff come forth with such information in its brief.

spinal stenosis.  (Tr. 236.)  Furthermore, there was no infiltrative lesions at the bone marrow, no

fractures present, and the paravertebral structures were intact.  (Tr. 236.)  Dr. Shankman

concluded that Plaintiff suffered from thoracic spinal cord syringomelia.  (Tr. 236.)

Upon examination of the cervical spine MRI, Dr. Shankman concluded that the disc

spaces were fairly well maintained, and the articular surfaces were intact.  (Tr. 237.)  There was

no evidence of disc herniation or spinal stenosis.  (Tr. 237.)  The lateral recesses and neural

foramina were not compromised, the facet joints were intact, and no subluxation was evident.

(Tr. 237.)  Plaintiff's cervical spinal cord and craniocervical junction also appeared intact.  (Tr.

237.)  No intradural, extramedullary lesions were apparent.  (Tr. 237.) No infiltrative lesions

were seen at the bone marrow, and no fractures were present.  (Tr. 237.)  The paravertebral soft

tissue structures also were intact.  (Tr. 237.)  Nevertheless, Dr. Shankman noted a mild disc

budge at C5-6.  (Tr. 237.)

3.      Dr. Paul McCormick

Dr. Paul McCormick examined Plaintiff on July 31, 2002.  (Tr. 226.)  He first noted that

Plaintiff was an otherwise healthy man, who had a history of trauma to the shoulder and scapular

region.  (Tr. 226.)  Plaintiff had been evaluated and treated over the years, but he had chronic

pain in this region.  (Tr. 226.)  Plaintiff contended that he had developed pain that affected the

entire left side of his body from the neck down, including his arm and leg.  (Tr. 226.)  An MRI of

the thoracic spine revealed thoracic syrinx extending from T3 to about T10, but Dr. McCormick

found that the cervical spine MRI did not reveal a chiari malformation.  (Tr. 226.)  However, Dr.

McCormick noted that Plaintiff's condition appeared to consist predominantly of pain.  (Tr. 226.)

Dr. McCormick also noted that Plaintiff reported numbness to pinprick, to pain, and light touch

on the left side.  (Tr. 226.)  His reflexes were fairly symmetrical, and his strength was good.  (Tr. 226.)  After his examination, Dr. McCormick concluded that Plaintiff had ideopathic syringomyelia extending up to the T3 level.  (Tr. 226.)  He also concluded, however, that Plaintiff's condition did not explain the pain and numbness down into the left arm.  (Tr. 226.)  Dr. McCormick recommended that Plaintiff undergo further MRI testing of his brain, and more thorough neurological evaluation from a neurologist.  (Tr. 226.)  Dr. McCormick did not believe surgical intervention for the isolated syrinx was warranted, but he did warn that some drainage could be required if the Plaintiff's condition progressed.  (Tr. 226.)

4.    Dr. Anthony K. Frempong-Boadu

The record indicates that Plaintiff consulted Dr. Anthony K. Frempong-Boadu in the months of June and July 2002.  (Tr. 228-37.)  Plaintiff was referred to Dr. Frempong-Boadu by an orthopedic surgeon, for neurosurgical evaluation of thoracic syringomyelia.  (Tr. 234.)  Dr. Frempong-Boadu noted that Plaintiff suffered from chronic shoulder pain, left hand numbness, decreased fine finger movements in the left hand, and numbness throughout the entire left side of his body.  (Tr. 230, 234.)  Other symptoms Plaintiff reported included decreased urinary stream, difficulty hearing on the left side, difficulty concentrating, and difficulty reading.  (Tr. 230, 234.)  Plaintiff reported pain in his left leg, as well as pain in his left neck and left arm when he slept.  (Tr. 234.)  Plaintiff also stated that he felt like his body was twisted and that his left shoulder felt like ice.  (Tr. 234.)  Dr. Frempong-Boadu found that despite his reported symptoms, Plaintiff had no abnormalities in his strength or reflexes of the upper or lower extremities.  (Tr. 232-34.)  Dr. Frempong-Boadu noted, however, that Plaintiff did have noticeable mild gait imbalance when walking, though he did not require the use of assistive devices.  (Tr. 230, 233-34.)

8

Upon further physical examination of Plaintiff, Dr. Frempong-Boadu found him fully conversant, verbally appropriate, able to follow commands, and possessing clear and fluent speech.  (Tr. 230.)  Plaintiff's cranial nerves were found intact (Tr. 230), deep tendon reflexes were +2 throughout (Tr. 230), and a motor examination revealed 5/5 motor strength in all muscle groups of the upper and lower extremities (Tr. 232-33).  Plaintiff was able to fully extend both hands, make fists, oppose his fingers, separate papers, and button buttons.  (Tr. 232.)  Plaintiff's sensation was intact to pinprick.  (Tr. 230.)  Testing demonstrated that Plaintiff had 5/5 pinch and grip strength in each hand.  (Tr. 232.)  Plaintiff had perfect full range of motion in his wrists, knees, hips, ankles, cervical spine, and lumbar spine.  (Tr. 232-33.)  Plaintiff, however, had diminished range of motion in his left shoulder and elbow.  (Tr. 232.)  Dr. Frempong-Boadu also noted that Plaintiff was able to squat, and walk on his heels and toes.  (Tr. 233.)

Dr. Frempong-Boadu reviewed the MRIs taken on July 11, 2002, and agreed that Plaintiff had evidence of thoracic spinal cord syringomyelia and mild disc bulge at C5-6.  (Tr. 230-31, 234.)  He resolved, however, that Plaintiff did not need surgical correction of the syrinx due to a lack of myelopathy.  (Tr. 230-31, 234.)  Dr. Frempong-Boadu stated that Plaintiff demonstrated no cognitive, behavioral, or psychological manifestations of his disease process.  (Tr. 235.)  Dr. Frempong-Boadu suggested that all heavy lifting, strenuous exercises, and the use of sharp or heavy objects should be avoided by Plaintiff.  (Tr. 233, 235.)  Finally,  Dr. Frempong-Boadu also suggested that Plaintiff seek the help of a pain management specialist.  (Tr. 235.)

5.    Dr. Richard N. Siegfried

Plaintiff was referred to Dr. Richard N. Siegfried by Dr. McCormick.  (Tr. 264.)  Plaintiff was first seen by Dr. Siegfried on August 30, 2002.  (Tr. 264-66.)  Dr. Siegfried found evidence

of local tenderness that produced the pain Plaintiff had in his left shoulder.  (Tr. 264.)  Plaintiff reported to Dr. Siegfried that he had developed pain in essentially all of the left side of his spine, as well as patches of numbness on left side of his body.  (Tr. 264.)  In addition to pain and numbness, Plaintiff also reported that he had some difficulty with urination, particularly in generating enough force to evacuate his bladder, as well as with ejaculation.  (Tr. 264.)  He also reported some problems with balance.  (Tr. 264.)  Plaintiff also told Dr. Siegfried that he had been prescribed Percocet to alleviate pain.  (Tr. 264.)

Dr. Siegfried's physical examination of Plaintiff revealed intact cranial nerves (Tr. 265). Plaintiff's sensation was intact to pinprick, except for decreased sensation of pinprick in the left lateral foot, left medial forearm, and dorsal surface of left hand.  (Tr. 265.)  Plaintiff had 2+ deep tendon reflexes everywhere except in the left knee which was 1+.  (Tr. 265.)  Motor strength was evaluated at 5/5 throughout the lower extremities bilaterally except for a measure of 5-/5 in Plaintiff's left hip flexors and extensors, and dorsal flexors of the left foot.  (Tr. 265.)

Dr. Siegfried's impression was that Plaintiff suffered from syringomyelia, with resulting neuropathic pain and dysfunction, and myofascial pain syndrome.  (Tr. 265.)  Nevertheless, Dr. Siegfried had difficulty relating the local tenderness and pain in the left shoulder region to the syringomyelia.  (Tr. 265.)  If the pain was entirely related, Plaintiff would not have tenderness in that region.  (Tr. 265.)  However, all the other worrisome neurological discomfort and signs exhibited by Plaintiff could be related back to the syringomyelia.  (Tr. 265.)  Dr. Siegfried asserted that Plaintiff was presently not a surgical candidate, but he was willing to help Plaintiff optimize his analgesic regimen by prescribing OxyContin and Elavil.  (Tr. 265-66.)

Plaintiff returned to Dr. Siegfried on September 3, 2002.  (Tr. 263.)  At that visit, Dr.

10

Siegfried's physical examination revealed that Plaintiff's cranial nerves were intact; his speech was fluent; his gait was within normal limits; and he was able to move all four extremities. (Tr. 263.) Plaintiff reported that the Elavil helped with his sleep, but not tremendously. (Tr. 263.) In addition, he reported that he had about 75% less pain when he woke up in the morning, though through the course of his day, his pain was essentially the same. (Tr. 263.) At some point, Plaintiff reported he decided to double his intake of Oxycontin, and noticed somewhat of a difference. (Tr. 263.) Otherwise, his status had not changed, and Dr. Siegfried's diagnosis was still neuropathic pain secondary to syringomelia. (Tr. 263.) Dr. Siegfried raised Plaintiff's dosage of Oxycontin and Elavil. (Tr. 263.)

Plaintiff again visited Dr. Siegfried on September 9, 2002, and stated that he was "doing quite well." (Tr. 262.) Plaintiff reported one episode of left arm shaking that was associated with a stressful event, but it was virtually gone when he awoke the following morning. (Tr. 262.) Plaintiff had no further episodes or worrisome neurological side effects. (Tr. 262.) Plaintiff told Dr. Siegfried that his present medication regimen was clearly effective. (Tr. 262.) In addition to reporting increased sleep, Plaintiff appeared to Dr. Siegfried much more calm and complacent than ever before. (Tr. 262.) Nevertheless, Plaintiff continued to complain about numbness in his left arm, though he acknowledged that it was probably a permanent situation. (Tr. 262.) His physical examination was unchanged as compared to his prior visits. (Tr. 262.) Dr. Siegfried's diagnosis remained neuropathic pain secondary to syringomyelia. (Tr. 262.) Dr. Siegfried concluded that Plaintiff had achieved a satisfactory state of analgesia from his current medication. (Tr. 262.) Dr. Siegfried noted that he would continue to follow Plaintiff for a month, but if he continued to be stable, Dr. Siegfried would discharge him to the care of his

11

primary care physician.  (Tr. 262.)

Plaintiff visited Dr. Siegfried a final time on April 29, 2003.  (Tr. 256.)  Plaintiff reported that his afflictions had remained at a status quo over the last year or so, and that he was on the same medication.  (Tr. 256.)  Dr. Siegfried noted some progression of symptoms in terms of increased numbness in the left upper extremity, and some sensation of low-voltage sensation going down in a C8 distribution.  (Tr. 256.)  Dr. Siegfried noted no other changes in Plaintiff's condition.  (Tr. 256.)  Plaintiff's current medications were Oxycontin, Elavil, and Paxil.  (Tr. 256.)  A physical examination revealed that Plaintiff had intact cranial nerves, fluent speech, gait within normal limits, and manual motor of upper extremities 5/5 in all groups.  (Tr. 256.)  His deep tendon reflexes were 2+ in the right biceps, triceps, and brachioradialis, but 0 in the left biceps, triceps, and brachioradialis.  (Tr. 256.)  The sensation he felt from a pinprick was intact throughout Plaintiff's upper extremities bilaterally, except for decreased pinprick sensation at the left lateral epicondyle.  (Tr. 256.)  Dr. Siegfried concluded that Plaintiff was still suffering from thoracic syrinx with upper extremity symptomatology, and that Plaintiff should continue on his present medications at their present doses.  (Tr. 256.)

6.    Division of Disability Determination Services

On January 3, 2003, a state agency physician completed a residual functional capacity ("RFC") assessment of Plaintiff.  (Tr. 240-47.)  Based on the RFC, Plaintiff was able to: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; push and/or pull with the limited use of upper extremities; and, occasionally climb a ramp/stairs, balance, stoop, kneel, crouch, or crawl.  (Tr. 241-42.)  Plaintiff was found to be

limited in his fingering (fine manipulation) abilities, but unlimited in his abilities to reach all directions (including overhead), to handle (gross manipulation), and to feel (skin receptors).  (Tr. 243.)  Plaintiff was found to have no environmental limitations (extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, etc), but the evaluator recommended Plaintiff avoid all exposures to hazards such as machinery, heights, etc. (Tr. 244.)

The state agency physician attributed all of Plaintiff's symptoms to syringomyelia, and determined that the severity of his symptoms was partially proportionate to the severity of his impairment, and only partially consistent with the total evidence.  (Tr. 245.)  Despite Plaintiff's allegations of numbness on the entire left side of his body, the physician found sensation completely intact upon examination.  (Tr. 245.)  Also, the physician found minimally decreased range of motion of the left shoulder, and decreased fine motor function of the hands.  (Tr. 245.) Otherwise, there was no significant findings of impairment upon the physician's examination of Plaintiff.  (Tr. 245.)  The physician noted that Plaintiff had been advised to avoid heavy lifting, as well as the use of sharp or heavy objects.  (Tr. 245.)  In sum, the state agency physician's proposed physical residual functional capacity assessment of Plaintiff was consistent with other treating/examining source conclusions about his limitations or restrictions.  (Tr. 246.)

       7.    <u>Dr. Robin O. Motz</u>

Dr. Robin O. Motz completed a first medical report on Plaintiff on February 25, 2003. (Tr. 249-53.)  Dr. Motz noted that he first treated Plaintiff on September 26, 2002, and observed that Plaintiff had difficulty with upper extremity motion due to syringomyelia.  (Tr. 249-50.) Next, Dr. Motz prepared his own RFC analysis on April 8, 2003, aimed at determining Plaintiff's

ability to do work-related activities on a day-to-day basis in a regular work setting.  (Tr. 258-61.)

Dr. Motz stated that Plaintiff's impairment affected lifting/carrying, but he did not quantify the

limitation.  (Tr. 258.)  Dr. Motz opined that Plaintiff's impairment also affected standing/walking

due to tremor, but he was unable to determine how many hours in an 8-hour work day Plaintiff

could stand and/or walk.  (Tr. 259.)  Dr. Motz estimated that Plaintiff could walk 15 feet without

interruption.  (Tr. 259.)  Dr. Motz also declared that Plaintiff's impairment did not affect his

ability to sit.  (Tr. 259.)  He found Plaintiff occasionally able to climb, stoop, crouch, kneel,

crawl, but he could never balance due to tremor and weakness.  (Tr. 259.)  Dr. Motz also

indicated that Plaintiff's ability to reach, handle, feel and push/pull would be affected by his

impairment.  (Tr. 260.)  Finally, Dr. Motz advised that Plaintiff "might fall" due to heights, and

that he "might get caught" in moving machinery.  (Tr. 260.)

       8.     <u>Ronald X. Spinapolice</u>

       Plaintiff first visited Ronald X. Spinapolice, who specializes in pain management and

certified in addiction medicine, on September 30, 2003.  (Tr. 294.)  Plaintiff complained of

severe left shoulder and upper back pain.  (Tr. 294.)  Plaintiff also revealed that he suffered from

increased anxiety and insomnia.  (Tr. 294.)  Spinapolice noted that Plaintiff had been on

Percocet, but had started to abuse it.  (Tr. 294.)  Spinapolice decided to discontinue the

Oxycontin medication, and instead prescribed Plaintiff Methadone for pain, and Restoril for

sleep.  (Tr. 294.)  Plaintiff began to visit Spinapolice every few weeks from October 2003 to June

2005.  (Tr. 293, 295-98.)  Records indicate that Plaintiff was doing well with the Methadone.

(Tr. 293, 295-98.)  Plaintiff also started to take Xanax in December 2003 (Tr. 293), and Klonopin

in April 2005 (Tr. 295).  Throughout his treatment with Spinapolice, Plaintiff suffered from

panic attacks (Tr. 295), insomnia (Tr. 293, 295), and persistent pain (Tr. 293, 295-97).  Plaintiff's

use of Paxil was discontinued in September 2004.  (Tr. 296.)

        9.    <u>Dr. Marc Weber - Division of Disability Determination Services</u>

        Plaintiff was examined by Dr. Marc Weber on December 2, 2005.  (Tr. 307-15.)

Plaintiff's history revealed that he continued to experience pain in his left shoulder, accompanied

by numbness in the left upper and lower extremities.  (Tr. 307.)  Plaintiff also complained he

suffered from loss of balance, and difficulty urinating, coupled with urinary hesitancy.  (Tr. 307.)

Plaintiff reportedly continued his use of Methadone, which provided relief of his symptoms.  (Tr.

307.)  He stated that he ambulated independently without an assistive device, and that he was

independent in activities of daily living.  (Tr. 307-08, 311.)  Plaintiff denied that he suffered from

any chest pain, shortness of breath or abdominal discomfort.  (Tr. 308.)

        Dr. Weber's physical examination of Plaintiff showed that Plaintiff was a well-

developed, well-nourished male, in no apparent distress.  (Tr. 308.)  He was found alert and

oriented, and his speech was clear and fluent.  (Tr. 308.)  Plaintiff was able to follow commands,

and his responses were appropriate.  (Tr. 308.)  Plaintiff's memory, both short-term and long-

term, was intact.  (Tr. 308.)  No atrophy of the left shoulder or rhomboid muscle was noted.  (Tr.

308.)  Plaintiff complained of a tingling sensation in his fingers, with compression of the left

rhomboid.  (Tr. 308.)  His muscle strength was 5/5 throughout the right upper and lower

extremities (Tr. 308), and 4/5 in the left upper and lower extremities (Tr. 308, 311).  His pinch

strength and lateral grip were 4/5 on the left, and 5/5 on the right.  (Tr. 308, 310.)  Plaintiff

complained of pain with left shoulder upon flexion past 120 degrees.  (Tr. 308.)  His muscle tone

was within normal limits.  (Tr. 308.)  Dr. Weber noted skin color changes in Plaintiff's left hand

(Tr. 308), and that his sensation was diminished to light touch, pinprick, and vibration in the left upper and lower extremities (Tr. 308).  Deep tendon reflexes were +2 in the right upper and lower extremities, and also +2 in the left upper and lower extremities.  (Tr. 308.)  A Romberg's test was negative, and his balance was good except in the standing dynamic position.  (Tr. 308.)  Plaintiff was able to extend his hands fully, make fists, and oppose his fingers.  (Tr. 308, 310.)  Plaintiff was able to lift a pin off the table, place it in the contralateral hand, and put it back down on the table.  (Tr. 308.)  Plaintiff was also able to separate papers (Tr. 308, 310), stand on his toes, and perform a squat (Tr. 308, 311).  He was unable to stand on his heels.  (Tr. 308, 310.)  Plaintiff was able to slowly ascend to and descend from the examination table without help.  (Tr. 308.)  Plaintiff's gait pattern was characterized by a decreased cadence, a forward flexed posture, and good minus balance.  (Tr. 308.)

Dr. Weber found that Plaintiff's ability to occasionally lift/carry was limited to 10 pounds, while his ability to frequently lift/carry was also limited to 10 pounds.  (Tr. 312.)  He found that Plaintiff's ability to stand and/or walk, and to sit were unaffected by his impairment.  (Tr. 312.)  He found, however, that Plaintiff's ability to push and/or pull was affected by his impairment.  (Tr. 312.)  These conclusions were supported by medical findings of left upper extremity weakness, left rhomboid tear, and thoracic syrinx.  (Tr. 313.)

Dr. Weber found Plaintiff able to frequently climb, kneel, crouch, crawl, and stoop, but that he could only occasionally balance.  (Tr. 313.)  Dr. Weber determined that Plaintiff was occasionally limited in his ability to feel objects and reach in all directions.  (Tr. 314.)  Plaintiff, however, had no limitations on his ability to handle objects (gross manipulation), and finger objects (fine manipulation).  (Tr. 314.)  According to Dr. Weber, these manipulative limitations

were caused by a limited range of motion in Plaintiff's left shoulder due to an injury to the rhomboid, and decreased sensation in the left hand.  (Tr. 314.)  Dr. Weber advised Plaintiff to avoid hazards such as heights due to impaired balance.  (Tr. 315.)  In sum, Dr. Weber's diagnosis was that Plaintiff had thoracic syringomyelia coupled with weakness and numbness in the left arm and leg.  (Tr. 308-09.)

      10.     <u>State Vocational Expert Donald Slive</u>

Vocational expert Donald Slive testified at Plaintiff's November 2, 2005 hearing.  (Tr. 396-410.)  The ALJ asked Slive to describe Plaintiff's past relevant work.  (Tr. 396.)  Slive stated that Plaintiff had worked as a bartender, Dictionary of Occupational ("DOT") code 312.474-101, and as a butcher, DOT code 525.381-014.  (Tr. 396.)  Slive evaluated that bartending was semi-skilled work requiring light physical demand.  (Tr. 396.)  He evaluated that butchery was skilled work requiring heavy physical demand.  (Tr. 396.)  Slive noted that all the skills acquired as a bartender and butcher were not transferable, i.e., they were job specific.  (Tr. 396.)

The ALJ then posed a series of hypothetical questions to Slive to determine what type of work Plaintiff could perform.  First, the ALJ asked if an individual "who was limited to light work; no frequent push-pull the upper left extremity; no ladders, rope, scaffolds; only occasional climbing of ramps and stairs; balancing, stooping, kneeling, crouching, and crawling; no fine fingering with -- no fine fingering [sic]; no hazards," could perform Plaintiff's past work as a bartender.  (Tr. 396-97.)  Slive responded that this person could bartend.  (Tr. 397.)  The ALJ then asked if that "same person unrestricted in sitting; walk no more than 15 feet at a time; only occasional climb, stoop, crouching, kneel, crawl; no balance, no frequent reach, handle, feel,

17

push-pull; no heights; moving machinery, could such a person perform their past relevant work."[4]
(Tr. 397.)  Slive replied that such a person could bartend.  (Tr. 397.)

Slive was also asked about the work available for an individual with the limitations
included in the two previous hypothetical questions, who was also restricted to simple, repetitive
tasks.  (Tr. 397.)  He testified that the individual could not work as a bartender.  (Tr. 397.)  Slive
nevertheless stated that an individual with such limitations could work as a machine feeder (DOT
code 699.686-010), an unskilled position requiring medium physical demand.  (Tr. 400.)

At the time of the hearing before the ALJ, there were 32,520 of these jobs in the national
economy, and 2,148 in the region.  (Tr. 400.)  Another job that could be performed by that
individual is that of a machine finisher (DOT code 690.685-170), which is also an unskilled
position requiring medium physical demand.  (Tr. 400.)  At the time of the hearing, there were
8,250 of these jobs in the national economy, and 459 within the region.  (Tr. 400.)

In the next hypothetical question, the ALJ asked Slive about the work available to an
individual that is restricted by: " No frequent push-pull with the upper extremities; no ladders,
ropes and scaffolds; only occasional ramp, stairs, bounce, stoop, kneel, crouch, crawl; no
frequent fine manipulation; no hazards.  So all that plus simple repetitive."  (Tr. 401.)  Slive
identified three possible unskilled positions that all required light physical demand: small
products assembler (DOT code 706.684-022) with 9,500 jobs in the national economy and 1,820
in the region; sales attendant (DOT code 299.677-010) with 56, 370 jobs in the national economy
and 6,180 in the region; and marker (DOT code 209.587-034) with 6,500 jobs in the national

---

[4]  The transcript of the hearing (Tr. 397-399) indicates that the ALJ's second hypothetical
is part of Dr. Motz's residual functional capacity ("RFC") evaluation of Plaintiff on April 8,
2003.  (Tr. 258-61.)

economy and 484 in the region.  (Tr. 401-02.)

The ALJ also asked Slive about the employability of an individual who needs to nap periodically throughout the day.  (Tr. 402.)  Slive affirmed that he would not be able identify any jobs in the national or regional economy that would allow napping, even if that individual was doing simple, repetitive tasks, or was able to concentrate up to at least a simple level.  (Tr. 402.)

Slive was then questioned by Plaintiff's attorney, Abraham S. Alter.  First, Mr. Alter asked about the positions available for an individual who was limited to sedentary work; had no use of his left arm or left leg because of weakness and numbness; and, who suffered from an anxiety disorder, which did not allow him to concentrate 15 minutes every hour.  (Tr. 403.)  Slive responded that he could not identify any jobs in the national economy with that RFC.  (Tr. 403.)  Next, Mr. Alter asked about the medium range jobs (machine feeder and machine finisher), first identified by Slive when he was interrogated by the ALJ.  (Tr. 403.)  Mr. Alter asked Slive if those jobs could be performed by a person who could not walk 15 feet.  (Tr. 403.)  Slive replied that those jobs were stationary.  (Tr. 403.)  Mr. Alter then asked how that person would get to those jobs if they were not able to walk 15 feet.  (Tr. 403.)  The ALJ interjected and said that it was not part of the hypothetical.  (Tr. 403.)  Mr. Alter replied that it was part of his question. (Tr. 403.)  Slive answered that a person would not be able to get to work if they could not walk 15 feet.  (Tr. 404.)  Mr. Alter then asked if it was true that in any hypothetical question where the person could not walk 15 feet, they could not work either.  (Tr. 404.)  Slive explained that he was under the assumption that the person could not walk 15 feet at work; if that person could not walk 15 feet at all, then that would present a different situation.  (Tr. 404.)  Slive also noted that a person had to get to work, but that a person did not necessarily have to walk to get to work; many

people are in wheelchairs and work.  (Tr. 404.)

Mr. Alter then asked if there were any jobs in the national economy in significant numbers that an individual could do if he was unable to concentrate for more than 15 minutes an hour due to any cause.  (Tr. 406.)  Slive responded that with that RFC, he would not be able to identify any jobs.  (Tr. 407.)  Mr. Alter also asked Slive whether a hypothetical individual who is groggy most of the day, because of the side effects of medication, would be able to perform any of the jobs mentioned during the hearing.  (Tr. 407.)  Slive replied that if a person could not *function* in terms of memory and orientation, then they could not work.  (Tr. 407.)  Mr. Alter continued his questioning by asking Slive to reaffirm that an individual would not be able to work if memory and/or orientation were *affected* by medication or by any cause.  (Tr. 407.)  At that point, the ALJ intervened and asked if Mr. Alter's hypothetical was based on an individual being "affected" or "not able to function."  (Tr. 407-08.)  Slive explained that if a person's grogginess was such that they *could not function* in terms of memory and orientation, then they could not work.  (Tr. 408.)

## IV. DISCUSSION

### A.    Standard of Review

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co.

v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard, 841 F.2d at 59).  The reviewing court must consider the totality of the evidence and then determine whether there is substantial evidence to support the Commissioner's decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom. Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

In determining whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; and (4) the claimant's educational background, work history and present age."  Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981). Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence that may also support a different conclusion. Blalock, 483 F.2d at 775.

**B.   Statutory Standards**

The claimant bears the initial burden of establishing his or her disability.  42 U.S.C. § 423(d)(5).  To qualify for DIB or SSI benefits, a claimant must first establish that he is needy and aged, blind, or "disabled."  42 U.S.C. § 1381.  A claimant is deemed "disabled" under the Act if

21

he is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Disability is predicated on whether a claimant's impairment is so severe that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp. 2d 302, 316 (D. Del. 2002).  Finally, while subjective complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A).  An impairment only qualifies as a disability if it "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

C.      **The Five-Step Evaluation Process And The Burden of Proof**

Determinations of disability are made by the Commissioner, pursuant to the five-step process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.[5]  20 C.F.R. § 404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is not "disabled," and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

At step two, the Commissioner must determine whether the claimant is suffering from a

_____

[5] Substantial gainful activity is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

severe impairment.  20 C.F.R. §§ 404.1520(a)(ii), (c).  An impairment is severe if it

"significantly limits [a claimant's] physical or mental ability to do basic work activities."  Id.  In

determining whether the claimant has a severe impairment, the age, education, and work

experience of the claimant will not be considered.  Id.  If the claimant is found to have a severe

impairment, the Commissioner addresses step three of the process.

At step three, the Commissioner compares the medical evidence of the claimant's

impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed

in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If the claimant's

impairment(s) meets or equals one of the listed impairments, he will be found disabled under the

Social Security Act.  If the claimant does not suffer from a listed impairment or its equivalent,

the analysis proceeds to steps four and five.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the

Third Circuit Court of Appeals found that to deny a claim at step three, the ALJ must specify

which listings[6] apply and give reasons why those listings are not met or equaled.  In Jones v.

Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the court noted that "Burnett does not

require the ALJ to use particular language or adhere to a particular format in conducting his

analysis.  Rather, the function of Burnett is to ensure that there is sufficient development of the

record and explanation of findings to permit meaningful review."  (Id.)  An ALJ satisfies this

standard by "clearly evaluating the available medical evidence in the record and then setting forth

that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant

---

[6] Hereinafter the "listings" refers to the list of severe impairments as found in 20 C.F.R.
Part 404, Subpart P, Appendix 1.

listing." Scatorchia v. Comm'r of Soc. Sec., 137 Fed. Appx. 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work. 20 C.F.R. § 404.1520(e). If the claimant is able to perform his past relevant work, he will not be found disabled under the Act. In Burnett, the Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work. This step involves three substeps: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

Burnett, 220 F.3d at120. If the claimant is unable to resume his past work, and his condition is deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must demonstrate that there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity. 20 C.F.R. § 404.1560(c)(1). If the ALJ finds a significant number of jobs that the claimant can perform, the claimant will not be found disabled. Id.

When the claimant has only exertional limitations, the Commissioner may utilize the Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet his burden of establishing the existence of jobs in the national economy. These guidelines dictate a result of "disabled" or "not disabled" according to combinations of vocational factors, i.e., age,

education level, work history, and residual functional capacity.  These guidelines reflect the administrative notice taken of the number of jobs in the national economy that exist for a given combination of vocational factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).  When the vocational factors coincide with all the criteria of a rule, the rule directs a conclusion as to whether an individual is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458 (1983).  The claimant, however, may rebut any finding of fact as to a vocational factor.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner, in the five-step process, "must analyze the cumulative effect of the claimant's impairments in determining whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  "The combined impact of the impairments will be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523; Parker v. Barnhart, 244 F. Supp. 2d 360, 369 (D. Del. 2003).  The burden, however, remains on the Plaintiff to prove that the impairments in combination are severe enough to qualify him for benefits.  See Williams v. Barnhart, 87 Fed. Appx. 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how a combination-effects analysis would have resulted in a qualifying disability); see also Marcus v. Barnhart, No. 02-3714, 2003 WL 22016801, at *2 (E.D. Pa. June 10, 2003) (stating that "the burden was on [Plaintiff] to show that the combined effect of her impairments limited one of the basic work abilities").

While Burnett involved a decision in which the ALJ's explanation of his step three determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit Court of Appeals applies its procedural requirements, as well as its interpretation of Jones, to

every step of the decision.  See e.g., Rivera v. Comm'r, No. 05-1351, 2006 U.S. App. LEXIS 2372, at *3 (3d Cir. Jan. 31, 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but need not "adhere to a particular format."  Id.

### D.    ALJ Findings

The ALJ applied the five-step sequential evaluation and determined that Plaintiff was not disabled within the meaning of the Act.  (Tr. 24.)  The ALJ found that Plaintiff satisfied step one of the evaluation process because he has not engaged in any substantial gainful activity at any time relevant to the decision.  (Tr. 20.)

In determining step two of the evaluation, the ALJ found that evidence established that Plaintiff has a severe spinal impairment:

> The evidence in this case reveals the claimant has a spinal cord syringomyelia in the thoracic spine that extends from the T3 to T10 level and is documented by findings adduced on MRI testing.  MRI testing also reveals disc bulging in the cervical spine.  Furthermore, medical reports contained in the record indicate the claimant has neuropathic pain, upper extremity sensory deficits and some degree of balance problems.

(Tr. 20 (internal citations omitted).)

In step three of the evaluation, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).  (Tr. 20.)   In considering step four, the ALJ found that Plaintiff is unable to perform his past relevant work as a butcher in light of his inability to engage in heavy lifting, and his limited ability to reach together with his left hand, and his sensory deficits and weaknesses.  (Tr.

26

22.)

Finally, in step five of the evaluation, the ALJ, relying on the testimony of vocational

expert, Slive, noted that based on Plaintiff's age, education, work experience, and residual

functional capacity, there are jobs that exist in significant numbers in the national economy that

Plaintiff can perform.  (Tr. 23.)  Slive testified that Plaintiff would be able to perform the

requirements of representative occupations, such as a marker in the retail trades.  (Tr. 23.)

### E.    Analysis

Plaintiff contends that the ALJ's decision is unsupported by substantial evidence in the

record.  (Br. in Support of Pl. 4.)  Additionally, Plaintiff argues that substantial evidence exists in

the record to support a finding of disability, pursuant to 42 U.S.C. §§ 405(g) and 1382.  (Br. in

Support of Pl. 4.)  Plaintiff asserts: (1) "the ALJ's finding at step three amounts to an

unarticulated fiat with regard to the listing of impairments" (Br. in Support of Pl. 11); and (2)

"the ALJ's RFC determination is unclear and unsupported" (Br. in Support of Pl. 19).

### 1.    *Did the ALJ's finding at step three amount to an unarticulated fiat with regards to the Listing of Impairments?*

Plaintiff argues that the ALJ's analysis of the evidence at step three of the sequential

evaluation is insufficient.  (Br. in Support of Pl. 13.)  In discussing step three, the ALJ said: "The

claimant does not have an impairment or combination of impairments that meets or medically

equals one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1."  (Tr. 20

(internal citations omitted).)  The ALJ is required to compare Plaintiff's impairments to the

Listing of Impairments:

> At step three, the undersigned must determine whether the claimant's

27

> impairment or combination of impairments meets or medically equals
> the criteria of an impairment listed in 20 [C.F.R.] Part 404, Subpart
> P, Appendix 1 (20 [C.F.R.] [§§] 404.1520(d), 404.1525, and
> 404.1526).  If the claimant's impairments or combination of
> impairments meets or medically equals the criteria of a listing and
> meets the duration requirement (20 [C.F.R.] [§] 404.1509), the
> claimant is disabled.  If it does not, the analysis proceeds to the next
> step.

(Tr. 19.)

Plaintiff specifically argues that the ALJ did not identify the specific listing or group of listings she utilized for comparison.  (Br. in Support of Pl. 13.)  In fact, Plaintiff asserts that the ALJ made no comparison.  (Br. in Support of Pl. 13.)  Plaintiff further insists that the ALJ did not discuss the medical equivalence in the record in any manner whatsoever, and did not identify which elements were missing from which criteria of which listing.  (Br. in Support of Pl. 13.)  Plaintiff also argues that the ALJ's statements at step three of the analysis (Tr. 20) cannot be the subject of any meaningful judicial review by this Court.  (Br. in Support of Pl. 13-14.)  He argues that, for these reasons, no Court can discern the basis for the ALJ's finding at step three of the sequential evaluation.  (Br. in Support of Pl. 13-14.)

Plaintiff contends that he meets Paragraph 11.19B of the listings because he suffers from syringomyelia, and the disease causes him disorganization of motor function.  (Br. in Support of Pl. 17.)  Plaintiff asserts that the ALJ's failure to acknowledge the Listing of Impairments, its requirements, and the satisfaction of those requirements by the medical evidence is reversible error.  (Br. in Support of Pl. 19.)

In her decision, the ALJ states:

> 3. The claimant has a severe spinal impairment (20 [C.F.R.] [§]
> 404.1520(c)).

> The evidence in this case reveals the claimant has a spinal cord syringomyelia in the thoracic spine that extends from the T3 to T10 level and is documented by findings adduced on MRI testing.  MRI testing also reveals disc bulging in the cervical spine.  Furthermore, medical reports contained in the record indicate the claimant has neuropathic pain, upper extremity sensory deficits and some degree of balance problems.  (Exhibits 11F, 12F, and 16F)
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 [C.F.R.] Part 404, Subpart P, Appendix 1 (20 [C.F.R.] [§§] 404.1520(d), 404.1525 and 404.1526)

(Tr. 20.)

These findings by the ALJ clearly demonstrate that the impairment under consideration was syringomyelia.  The ALJ did not explicitly refer to Listing 11.19, but the evidence considered by the ALJ, and outlined following the aforementioned findings, can only refer to syringomyelia.  (Tr. 21-22.)  Under Burnett, the ALJ is required to identify which listings apply and give reasons why those listings are not met.  220 F.3d at 119-20, 120 n.2.  The function of Burnett is to "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  Jones, 364 F.3d at 505.  This standard can be satisfied without identifying a specific listing, so long as the ALJ clearly evaluates the relevant medical evidence.  Scatorchia, 137 Fed. Appx. at 471.

Although Plaintiff did have syringomyelia, to fully meet or equal Listing 11.19, Plaintiff must have a diagnosis of syringomyelia coupled with:

> A. Significant bulbar signs; or
> B. Disorganization of motor function as described in 11.04B.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 11.19.  Listing 11.04B requires that an individual demonstrate:

29

B. Significant and persistent disorganization of motor function[7] in two extremities, resulting in sustained disturbance of gross and dextrous movements, or gait and station.

In the instant case, the ALJ comprehensively reviewed all the evidence in the record before concluding that Plaintiff did not meet or equal Listing 11.19B.  (Tr. 20-21.)  In Arroyo, the Third Circuit stated, "although we would encourage ALJs to specifically identify the listed impairments under consideration, we are able to discern the particular listed impairments considered in this case based on the ALJ's discussion of the relevant evidence."  Arroyo v. Commissioner of Social Security, 155 Fed. Appx. 605, 608 (3d Cir. 2005).  Like in Arroyo, here the ALJ specifically reviewed Plaintiff's claims that he was disabled; unable to work due to pain and poor balance; and, at times "groggy" due to medication.  (Tr. 21.)  The ALJ found no relevant evidence supporting Plaintiff's assertion that he had significant and persistent disorganization of motor function in his extremities, resulting in sustained disturbance of movement, or gait and station.  The ALJ considered medical evidence from treatment records by Dr. Frempong-Boadu, Dr. Siegfried, Dr. Motz, and Mr. Spinapolice, as well as Dr. Weber's report.  (Tr. 21-22.).  All treatment records, medical reports, and hearing testimony referenced by the ALJ are included in the record.

In November 2002, Dr. Frempong-Boadu reported that, except for some decreased fine finger movements in the left hand, which made writing and grasping onto objects difficult (Tr.

---

[7] "Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerberall, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of neurological impairment.  The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms."  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 11.00C.

21, 230, 234), Plaintiff had normal motor, sensory and reflex functions in the upper and lower extremities (Tr. 21, 230, 232-34). Likewise, except for some decreased sensation in the left epicondyle (Tr. 21, 256), after a physical examination in April 2003, Dr. Siegfried found intact Plaintiff's upper and lower extremity motor, sensory and reflex functions (Tr. 21, 256). Dr. Siegfried's December 2005 examination revealed that Plaintiff's spinal abnormalities had not resulted in any disuse atrophy, and, instead, that Plaintiff retained essentially intact neurological functions (Tr. 21, 308), and remained able to ambulate independently (Tr. 21, 307-08, 311). Although Plaintiff had some decreased strength in his left hand (Tr. 21, 308, 310), Dr. Weber, another examining physician, noted that Plaintiff remained able to oppose his thumb and fingers as well as make a fist (Tr. 21, 308, 310). Likewise, despite any weakness and numbness in the left hand, Dr. Weber indicated that Plaintiff remained able to lift a pin from a tabletop and separate papers. (Tr. 21, 308, 310.)

Significantly, while Plaintiff has been diagnosed with syringomyelia with neuropathic pain and dysfunction, treatment records by Mr. Spinapolice show that Plaintiff is responding well to treatment, reporting good pain relief from medication, and has virtually no complaints. (Tr. 21, 293, 295-98.) Although Plaintiff revealed spinal abnormalities on diagnostic testing, Dr. Weber reported he remains able to stand, walk, and sit without limitation, as well as engage in light lifting. (Tr. 21, 312.) Plaintiff was found limited in his ability to reach secondary to pain (Tr. 21-22, 314), and he was advised to avoid heights as the result of underlying balance problems (Tr. 22, 315). Dr. Motz is the only treating doctor that has indicated that Plaintiff experiences some balance problems. (Tr. 21, 259.) Reports from Dr. Frempong-Boadu (Tr. 21, 230, 234) and Dr. Weber (Tr. 21, 308) indicate that Plaintiff only occasionally has a problem

31

with balance.

The ALJ's discussion of this evidence provides a sufficient basis for this Court to perform a meaningful review of her step three finding.  According to the record, which includes the medical reports described herein and discussed by the ALJ, Plaintiff does not have a persistent and significant disorganization of motor function or a sustained disturbance of gross and dextrous movements, or gait and station.  Syringomyelia alone is insufficient to meet or equal Listing 11.19.  The ALJ's determination that Plaintiff does not meet the criteria of Listing 11.19 is supported by substantial evidence.

### 2.    *Is the ALJ's RFC determination unclear and unsupported?*

In the instant case, Plaintiff argues that the ALJ's RFC determination is unenforceable and unworthy of judicial review because it is unaccompanied by any evidentiary foundation.  (Br. in Support of Pl. 21.)  Plaintiff argues that the ALJ is duty bound to articulate a defensible, rational, evidentiary case regarding the crucial issue of what the claimant can still do despite his impairments, and what he cannot do because of those impairments.  (Br. in Support of Pl. 19.)  Plaintiff contends that the ALJ engaged in an insufficient blanket recitation of the evidence followed by an announcement of his RFC.  (Br. in Support of Pl. 20.)  Plaintiff maintains that the ALJ must explain which evidence contradicts his finding, and which evidence supports his finding, and why one set of medical data is found more persuasive than the other.  (Br. in Support of Pl. 20-21.)  Plaintiff also argues that the ALJ's RFC determination does not take into account the hearing testimony of the vocational expert.  (Br. in Support of Pl. 22.)   Plaintiff claims that the ALJ never revealed which hypothetical question was utilized in the final decision; the ALJ never cited none of her hypothetical questions to the vocational expert; and the ALJ never

32

acknowledged Plaintiff's counsel's cross-examination of that vocational expert.  (Br. in Support

of Pl. 23.)

The ALJ's final decision states:

> 5. After careful consideration of the entire record, the undersigned
> found Plaintiff has the residual functional capacity to lift high objects,
> such as those weighing up to twenty pounds, and sit, stand and walk
> as needed, but cannot perform more than occasional reaching,
> pushing, pulling or tasks requiring feeling with the left arm and non-
> dominant hand.  Additionally, as a result of his medication, the
> claimant is unable to engage in complex or detailed tasks on a
> sustained basis.

> In making this finding, the undersigned considered all symptoms in
> accordance with the requirements of 20 [C.F.R.] [§] 404.1529 and
> SSRs 96-4p and 96-7p.  The undersigned also considered opinion
> evidence in accordance with the requirements of 20 [C.F.R.] [§]
> 404.1527 and  SSRs 96-2p, 96-5p and 96-6p.

(Tr. 21.)

Plaintiff contends that the ALJ's RFC assessment is unclear and unsupported by

evidence: "Since the residual functional capacity will determine disability the core and crux of an

administrative decision must certainly be the explanation of how the evidence yields the

capacity."  (Br. in Support of Pl. 21.)  This Court finds that the ALJ did comprehensively identify

and discuss the evidence utilized in making her finding.  In Burnett, the Third Circuit stated that

in making a residual functional capacity determination, the ALJ must consider all evidence

before him.  Although the ALJ may weigh the credibility of the evidence, she must give some

indication of the evidence which she rejects and her reasons(s) for discounting such evidence.

Burnett, 220 F.3d at 121.  Burnett, however, does not require the ALJ to use particular language

or adhere to a particular format in conducting her analysis.  Jones, 364 F.3d at 505.  Rather, the

function of Burnett is to ensure that there is sufficient development of the record, and explanation

33

of findings, to permit meaningful review.  Id. at 505.

In the first portion of the "Analysis" section, this Court reviewed in detail all the evidence in the record considered by the ALJ in making her step three finding.  Much of that same evidence forms the basis of the ALJ's determination of Plaintiff's RFC.  For the sake of brevity, that evidence will not be repeated here.

In addition to referring to this same evidence, the ALJ clearly explained why she had accepted some evidence, while rejecting other evidence.  The ALJ stated:

> At the hearing the claimant testified he is disabled and unable to work due to pain and poor balance.  He also states he takes medications that make him feel "groggy."
>
> Although the medical evidence documents impairment severity, it does not support the presence of incapacitating or disabling symptoms.  Instead, the positive findings reflected in the record tend to suggest the claimant has a lesser degree of symptoms and a higher degree of functioning than asserted.  In this respect, while the claimant had cervical disc bulging on MRI testing, this is identified as only a mild abnormality.  More importantly, diagnostic testing does not reveal the presence of any spinal stenosis, cord compression or nerve root involvement. (Exhibit 4F, page 10).
>
> Additionally, despite his cervical disc bulging and thoracic syringomyelia, physical examinations did not adduce any evidence of significant neurological deficits attributable to any spinal abnormalities.

(Tr. 21.)  Also, while Dr. Motz states that Plaintiff experiences some balance problems  (Tr. 21, 259), the ALJ discredited that evidence based on Dr. Frempong-Boadu's (Tr. 21, 230, 234) and Dr. Weber's (Tr. 21, 308) findings that Plaintiff only occasionally has a problem with balance.  The RFC found in this case is consistent with the findings by Dr. Weber (Tr. 307-314) and Dr. Frempong-Boadu (Tr. 228-35).  (Tr. 22.)  Additionally, an assessment by a state agency

physician (Tr. 240-47) is also consistent with the residual functional capacity identified by the ALJ.  (Tr. 22.)

Dr. Motz has provided an assessment indicating that Plaintiff has limitations imposed on his ability to stand, walk, and lift, but Dr. Motz provided no specifics regarding the degree of limitations imposed on Plaintiff.  (Tr. 22, 259.)  For Dr. Motz's opinion to be given any weight, it must be well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not be inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2).  As Defendant points out, Dr. Motz did not provide any records, such as treatment notes or laboratory notes, to support the limitations he assessed.  (Def.'s Br. 20.) Furthermore, Dr. Motz's opinion is not consistent with the opinions of other doctors.  (Def.'s Br. 20.)  The sum of the contrasting evidence detracts from the credibility of Dr. Motz's opinion, and, in this context, the ALJ properly determined it to be of little probative weight.  (Def.'s Br. 20.) The ALJ thereby thoughtfully weighed the medical evidence before determining Plaintiff's RFC.  Based on the medical evidence in the record, the ALJ found that Plaintiff's impairments were not severe enough to render him disabled.

Plaintiff's continued activity level also tends to belie the degree of debilitation alleged. (Tr. 22.)  In particular, Plaintiff engages in a wide range of activities demonstrating that he retains the ability to perform activities requiring at least low levels of exertion, as well as the ability to use his hands adequately, focus, concentrate, and maintain attention.  (Tr. 22.) Specifically, although Plaintiff may have abnormalities in the cervical and thoracic areas of the spine, Dr. Weber observed no difficulties when he climbed on and off the examining table, such as one might expect in an individual with the degree of pain alleged.  (Tr. 22, 308.)  Furthermore,

testimony at the hearing reveals that Plaintiff remains able to drive his car whenever the need

arises (Tr. 22, 361, 378-79), shop (Tr. 22, 345, 361, 378-80), prepare meals (Tr. 22, 344-45, 380-

82), and clean his residence (Tr. 22, 346, 380-81), including the occasional operation of a

vacuum cleaner (Tr. 22, 380).  All of these activities require Plaintiff to use his hands to grip and

manipulate.  (Tr. 22.)  Plaintiff has also indicated that he lives with his disabled mother and is

able to monitor her health and supervise her activities throughout the day, which clearly requires

at least some degree of focus and attention.  (Tr. 22, 329, 382-83.)

Additionally, while Plaintiff has impairments that impose limitations on his functional

ability, the ALJ was not persuaded by Plaintiff's statements concerning the intensity, duration,

and limiting effects.  (Tr. 22.)  The ALJ must consider and weigh all of the non-medical evidence

before him.  Burnett, 220 F.3d at122 (citations omitted).  Although allegations of pain and other

subjective symptoms must be consistent with objective medical science, the ALJ must still

explain why he is rejecting some of Plaintiff's testimony.  Id. at 122 (citations omitted).  In this

case, the ALJ discounted Plaintiff's reported symptoms based on his own hearing testimony.

(TR. 355-95.)  Additionally, the previously referenced medical evidence demonstrates that

Plaintiff is relatively alert and mobile when performing daily tasks.  Barnhart, 87 Fed. Appx. at

243 (considering cumulatively the inconsistencies and other relevant record evidence, and

concluding that substantial evidence supported the ALJ's adverse credibility finding.)  The ALJ's

credibility determination is supported by substantial evidence.

Plaintiff also states that the RFC determination by the ALJ does not remotely resemble

any of the hypothetical questions posed to the vocational expert, Mr. Slive.  (Br. in Support of Pl.

22.)  The last portion of the "Medical Evidence Considered by the ALJ" section in this Opinion

thoroughly discusses the testimony of Mr. Slive during the November 2, 2005 hearing.  (Tr. 396-

410.)  In one of the hypothetical questions, the ALJ asked Slive about the work available to an

individual that is restricted by: "No frequent push-pull with the upper extremities; no ladders,

ropes and scaffolds; only occasional ramp, stairs, bounce, stoop, kneel, crouch, crawl; no

frequent fine manipulation; no hazards.  So all that plus simple repetitive."  (Tr. 401.)  Contrary

to Plaintiff's argument, this hypothetical question closely resembles the ALJ's RFC

determination:

> After careful consideration of the entire record, the undersigned found
> Plaintiff has the residual functional capacity to lift light objects, such
> as those weighing up to twenty pounds, and sit, stand and walk as
> needed, but cannot perform more than occasional reaching, pushing,
> pulling or tasks requiring feeling with the left arm and non-dominant
> hand.  Additionally, as a result of his medication, the claimant is
> unable to engage in complex or detailed tasks on a sustained basis.

(Tr. 21.)  Plaintiff's argument that the ALJ's final determination does not consider the

hypothetical questions posed to the vocational expert is unsound and inaccurate.

Plaintiff also falsely asserts that none of the hypothetical questions considered the fact

that he was limited to simple tasks because of his medication.  (Br. in Support of Pl. 23.)  Not

only does the aforementioned hypothetical mention the simple task limitation, but the ALJ's final

RFC states that Plaintiff is unable to engage in complex or detailed tasks on a sustained basis as a

result of his medication.  (Tr. 21.)  Plaintiff's argument that the ALJ ignored his limitation to

simple tasks, therefore, is unfounded.

Plaintiff also claims that the ALJ never acknowledged his counsel's cross-examination of

the vocational expert where the expert found him incapable of walking 15 feet to go to work.

(Br. in Support of Pl. 23-24.)  As this Court has explained, Dr. Motz identified this limitation in

his report, but the ALJ discredited that evidence because Dr. Motz did not provide any specifics with respect to the degree of limitations imposed.  (Tr. 22, 259.)  Although the ALJ may weigh the credibility of the evidence, she must give some indication of the evidence she rejects and her reasons for discounting such evidence.  Burnett, 220 F.3d at 122 (citations omitted).   Since the asserted ambulatory limitation was inconsistent with the rest of the evidence in the record, the ALJ had authority to disregard it in determining Plaintiff's RFC.  The ALJ thereby has concluded properly that Plaintiff retains the ability to walk as needed.  (Tr. 21.)

In addition, the ALJ did include the limitation that a person could not walk more than 15 feet without interruption in two of her hypothetical questions to the vocational expert.  (Tr. 397.) First, the ALJ asked if an individual "who was limited to light work; no frequent push-pull the upper left extremity; no ladders, rope, scaffolds; only occasional climbing of ramps and stairs; balancing, stooping, kneeling, crouching, and crawling; no fine fingering with -- no fine fingering [sic]; no hazards," could perform Plaintiff's past work as a bartender?  (Tr. 396-97.)  Slive responded that this person could bartend.  (Tr. 397.)  The ALJ then asked if that "same person unrestricted in sitting; walk no more than 15 feet at a time; only occasional climb, stoop, crouching, kneel, crawl; no balance, no frequent reach, handle, feel, push-pull; no heights; moving machinery, could such a person perform their past relevant work?"  (Tr. 397 (emphasis added).)  Slive replied that such a person could bartend.  (Tr. 397.)  Slive was also asked about the work available for an individual with the limitations included in the two previous hypothetical questions who was also restricted to simple, repetitive tasks.  (Tr. 397 (emphasis added).)  He testified that the individual could not bartend.  (Tr. 397.)

In Jones, the plaintiff argued that the ALJ erred in disregarding the vocational expert's

response to one of her counsel's hypothetical questions.  Jones, 364 F.3d at 506.  Plaintiff's

counsel's hypothetical question was largely based on testimony that the ALJ had previously

discredited.  Id. at 506.  Since the hypothetical question was inconsistent with the evidence on the

record, the ALJ had authority to disregard the response.  Id. at 506.  Similarly, here, the ALJ's

final RFC analysis does not include the limitation that Plaintiff could not walk more than 15 feet.

The ALJ is not required to accept the assumptions posited by Plaintiff's counsel based on Dr.

Motz's medical findings when those findings had been discredited.  Jones, 364 F.3d at 506.  The

ALJ properly omitted the unsupported hypothetical questions and answers.

The ALJ relied on substantial evidence to achieve her final decision.  Based on the

testimony of the vocational expert, considering Plaintiff's age, education. work experience, and

RFC, the evidence in the record supports the ALJ's conclusion that Plaintiff is capable of making

a successful adjustment to other work that exists in significant numbers in the national economy.

The ALJ's conclusion that Plaintiff was not disabled, as defined by the Social Security Act,

therefore is affirmed.

## IV. CONCLUSION

For the reasons stated above, this Court finds that Commissioner's decision is supported

by substantial evidence and is affirmed.

Dated: May 8,  2007

 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

39